UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JUNIUS A. SIMON, JR., § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 4:10-CV-1927 |
| § | |
| JACQUELINE HARLEY BELL, § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Jacqueline Harley Bell's Motion to Substitute and Dismiss (Doc. No. 5). After considering the Motion, all responses thereto, the evidence provided at a hearing held on February 15, 2011, and the applicable law, the Court finds that Defendant's Motion to Substitute and Dismiss (Doc. No. 5) should be granted.

### I. BACKGROUND

This case involves a claim of tortious interference of contract brought by Junius A. Simon, Jr. ("Plaintiff" or "Simon") against Jacqueline Harley Bell ("Defendant" or "Bell"), the Regional Director of the Houston Passport Office, in her individual capacity. The Court previously granted Plaintiff's Motion for an Evidentiary Hearing. (Doc. 21). The following facts are drawn from the testimony and exhibits presented at the evidentiary hearing.

Simon is the former Site Security Manager ("SSM") at the Houston Passport Office, and in this position, was employed by Inter-Con Security Systems, Inc. ("Inter-Con"). (Tr. 98:8.) Inter-Con had been awarded a contract by the U.S. Department of State, Bureau of Diplomatic Security ("Diplomatic Security"), to provide security services to the Passport Office. (*Id.* 11:15-21.) As SSM, Simon was responsible for overseeing physical security at the Houston Passport

1

Office and responding to threats to persons or property. (*Id.* 98:8-14.) Simon was subject to the chain-of-command and procedures outlined in General Order 1.1, which was issued and approved by Diplomatic Security. (Ex. 15; Tr. 177:8-13.) General Order 1.1 instructs that officers such as Simon "shall not accept orders from any personnel other than those listed in the Chain of Command or a DSO." (*Id.* at 4.) "All orders received from other personnel shall be referred through the chain of command to the COR." (*Id.*) Simon was prohibited from releasing information "regarding any policies, procedures or operations to anyone other than those persons listed in the Chain of Command." (*Id.*) Simon's chain of command included a watch commander (an Inter-Con employee), an assistant deputy project manager, a deputy project manager, an assistant project manager, and a project manager. (*Id.*) The DSO was a State Department employee. During the times relevant to this case, the DSO was Martin Wishnefsky ("Wishnefsky"). (Tr. 117:21-118:2.)

Simon began working with Bell when Bell became Regional Director of the Houston Passport Office in 2002. (Tr. 7:17-20.) As Regional Director, Bell's major duties involved the issuing passports to eligible citizens, establishing criteria for passport issuance, maintaining security over passport issuance, and preventing passport fraud. (*Id.* 9:8-10, 9:16-17, 9:23, 10:13.) As part of her general duty to oversee the operations of the Houston Passport Office, Bell was tasked with ensuring that all passport applicants were not "disruptive" and that all passport agency employees were "protected." (Tr. 46:3-6, 149:21-25.) She was required to report to her superiors about site security issues in her office. (Tr. 50:5-8, 151:8-15155:21-23.) Though she did not work for Diplomatic Security or oversee the hiring of Inter-Con, Bell provided information to Diplomatic Security on how many site security personnel were needed. (Tr.

11:18-19, 14:3-10.) Bell was also responsible for ensuring that Department of State regulations were followed. (Tr. 48:7-9.)

Bell and her superiors interpreted her duties expansively. In a letter written to Congressman Poe's office, Bell stated that she possessed "the responsibility of ensuring the workplace safety of *all government and contract employees employed in the Mickey Leland Federal Building*." (Ex. 13 (emphasis added)). She worked in "collaboration" with Simon in ensuring the security of the Passport Office, though she had no formal security training. (Tr. 15:17-20, 19:13-14, 37:18-25.) Bell was responsible for providing feedback on Simon's performance to Diplomatic Security and could make a request for removal of a contractor. (Tr. 75:21-24, 163:13-15, 164:10-19, 181:20-182:2, 183:7-9.) However, she acknowledged that she did not supervise Simon, did not conduct formal performance reviews, and could not make hiring or firing decisions. (Tr. 15:12-16.) Though Bell did not work for Diplomatic Security, she believed that she was the "eyes and ears for Diplomatic Security" with respect to site security in the office. (Tr. 56:20-24.) Bell also believed that she was the point of contact for access to the Passport Office's space because she was "head of the agency." (Tr. 64:2-6.)

Bell and her supervisor Gary Roach ("Roach") considered Simon's duties to include providing Bell with timely information on the activities concerning the federal building, the fourth floor public area of the Passport Office, and the security of the employees. (Tr. 53:18-20, 154:5-13, 157:17-158:1.) Both knew that Simon had his own chain-of-command that he was required to follow. (Tr. 84:6-10, 160:15-16.) Simon's chain-of-command did not include Bell. (Tr. 121:13-14.) Moreover, General Order 1.1 specifically prohibited Simon from sharing information about security operations with anyone other than the chain-of-command or Wishnefsky. (Ex. 15 at 4.) However, Bell and Roach expected Simon to fulfill Bell's requests

3

first and then report the action to his chain of command later, even though this arrangement would conflict with the orders Simon was given by Inter-Con and Diplomatic Security. (Tr. 160:19-20, 166:13-167:19.) Bill Evans ("Evans"), the Diplomatic Security officer and contract representative ("COR") that was in charge of the Inter-Con contract, stated that nothing in General Order 1.1 prevented Simon from communicating information to Bell or implementing Bell's requests immediately. (Tr. 120:25-121:3, 179:11-180:6.)

The conflict between Bell's duties and expectations of Simon, on one hand, and Simon's chain-of-command, on the other, quickly became apparent. Bell made certain requests of Simon that Simon could not immediately fulfill due to his chain-of-command and standing Inter-Con orders. (Tr. 101: 10-23.) One example involved Bell's request that Simon provide her with copies of the reports that he provided to his chain-of-command. (Tr. 26:14-22, 62:11-13.) Simon was prevented from doing so by General Order 1.1. However, Simon went up his chain-of-command, obtained permission to provide Bell with his reports, and subsequently began to do so. (Tr. 89:4-7.) Simon stated that this state of affairs frustrated Bell because he could not give Bell what she wanted immediately. (Tr. 100:19-23.) Bell says that she remained dissatisfied because of Simon's failure to include correct information on his reports. (Tr. 89:8-10.) This incident was the subject of one of Bell's complaints to her superiors. (Tr. 26:21-27:3.)

After this incident, Bell continued to believe that Simon fell short of his duties and failed to accede to her requests. As an initial matter, we point out a discrepancy in Bell's testimony about her ability to directly view many of the pertinent incidents. Bell's office was on the fourteenth floor of the building, while the public area was on the fourth floor, and Simon's office for much of the relevant period was in the basement. (Tr. 27:4-10.) Bell testifies on one hand that she was not physically present in the public areas of the Passport Office and could not see what

was going on there. (Tr. 63:17-19.) On the other hand, she states that she had a monitor in her office where she could see the public area. (Tr. 81:14-17.) Bell simultaneously asserts that she was ignorant of certain issues that cast her in a poor light (such as the breastfeeding incident discussed below), while stating that she was aware of other issues that cast Simon in a poor light (such as his non-presence in the public area). (Tr. 63:17-19, 27:4.)

Bell's initial problem with Simon occurred over the issue of secondary screening procedures. Bell had been given a directive from her superior to cease secondary screening because the Houston Passport Office was housed within a federal building, where visitors would already be screened by the Federal Protective Service. (Tr. 59:22-60:21.) Simon, on the other hand, had orders to conduct secondary screening. Another issue involved lost property procedures. Bell asked Simon to turn over lost property to her after business hours so that the Passport Office staff could return the property to its owners if they came to the Passport Office that night. (Tr. 60:25-61:12.) If the property owner did not return that same day to collect the lost item, Bell would turn the property back over to Simon the following morning. (Tr. 61:8-9.) Simon was under orders imposed by his employer, Inter-Con, to lock away all lost property in storage until its owner came back to retrieve it. (Tr. 123:24-124:4.) Yet another issue involved media access. Bell asked Simon to carry out certain directives that she had received from her own superiors regarding media access to and in the Passport Office. (Tr. 61:16-25.). Simon did not have the authority to change his procedures simply upon Bell's request, so he had to seek permission through his chain of command. (Tr. 124:8-10.) Ultimately Simon received permission to change the procedures as Bell had requested. (Tr. 124:11-12.)

Still another incident involved breastfeeding in public areas of the office. Simon states that he received complaints from the public about breastfeeding women. (Tr. 102:15-18.) He

took those complaints to Bell, who stated that she agreed with those who called the practice "offensive." (Tr. 102:3.) Simon and Bell determined that Simon and his personnel would request breastfeeding women either to cover themselves or to relocate. (Tr. 102:24-103:1.) When one of the security guards made that request to a breastfeeding woman, her subsequent complaint led to an investigation and the discovery of a federal statute that protects the right of women to breastfeed in federal buildings. (Tr. 102:9-12, 103:6-10.) During the investigation, Bell stated that she did not recall having a conversation with Simon about breastfeeding in the lobby. (Tr. 103:12-14.)

Bell refers to "shelter in place" exercises where Simon showed poor judgment by bringing the public behind the "firewall" separating the public from Passport Office employees. (Tr. 72:13-73:3.) However, Bell acknowledged that the "shelter in place" idea came from one of her own subordinates, Eric Botts ("Botts"). (Tr. 86:17-21.)

Bell also complained of an occasion where Simon escorted a repair technician into the Passport Office. The technician needed access to a certain item, which was located in a secure area of the office. (64:21-22.) The secure area contained blank passport books and other sensitive material. (64:12-17.) Only a handful of Passport Office employees, who were listed by name and title on the front of the door to the secure area, could access it. (65:5-9.) Simon did not have access to the secure area and so asked another Passport Office employee to give him access to it. (65-15-17.) According to Bell, it was improper for Simon to even ask another employee to provide him with access to the area. (64:18-20.) However, she later stated that it was appropriate for Bell to find someone on her management team who had authority to open the vault and to make sure that it was secured. (65:18-21.) Ultimately Bell acknowledged that she did not know who Simon asked for access to the vault. (65:15-17.) Bell also acknowledged that Simon could

6

not change the point of contact for access into the office from himself, but simply wanted to be "informed" when unauthorized individuals needed access to secure areas of the office. (Tr. 90:2-17.)

Another incident related to a steak knife that an employee was able to bring into the office without detection. Bell, who was in Washington, DC at the time, was informed of the incident through one of her State Department colleagues, rather than by Simon himself. Bell believed that Simon should have handled the situation by first informing Botts of the incident and that Botts, in turn, would have reported the incident to Wishnefsky and other officials. (Tr. 52:6-10.) Instead, Simon, in line with his chain of command, had reported the incident to Wishnefsky and Wishnefsky had contacted Bell. (Tr. 51:16-19.)

Bell believed that Simon was not visible in the fourth floor public area even though, according to her, he should have been. (Tr. 27:4.) However, Simon's office was in the basement, and he was not allowed to move into his office on the fourth floor until sometime in early 2009. (Tr. 27:6-8, 28:3-15.) Moreover, Inter-Con guards staffed the public area on a schedule under Simon's supervision. (Tr. 28:19-29:5.) Bell admitted that she had access to security when she needed it. (Tr. 29:4-5.)

According to Bell, Simon's subordinates also complained about not being able to find him and that he did not have a radio. (Tr. 57:17-24, Ex. 3.) Simon informed Botts that the shortage of radios was due to additional officers being sent to the office without radios. (Tr. 106:6-15.) Simon stated that he was with a guard who had a radio at all times. (*Id.*) Botts later emailed Wishnefsky about the radio shortage. (Ex. 4.) Though Botts acknowledged that Simon patrolled all of the necessary Passport Office areas, Botts believed that Simon's provision of his radio to a new officer showed "poor judgment" and "lack of commitment." (*Id.*)

Bell states that her passport officers complained that Simon's subordinates were giving out incorrect information to passport applicants about the need for appointments and referring applicants to congressional offices. (Tr. 58:11-16.) Simon states that the procedure in the Passport Office for several years had been to ask applicants whether they had an appointment. (Tr. 107:5-12.) The Passport Office's policy subsequently changed to accept all applicants regardless of whether they possessed an appointment. (*Id.*) Simon acknowledges that some mistakes may have been made by his officers during the transition. (*Id.*) Simon states that Bell never made a complaint to him about any particular officer or any particular incident. (*Id.*)

Bell began complaining to her superiors about Simon's job performance shortly after she began work in Houston. (Tr. 25:17-19.) Botts, with the approval of Bell, also sent complaints to Bell's superiors. (Tr. 56:13-14.) Bell believed that Simon was being disrespectful of her and failed to communicate properly. (Tr. 23:25-24:1.) Bell believed that Simon did not share necessary information with his staff, but acknowledged that she did not have first-hand knowledge of this. (Tr. 26:6-13.)

Diplomatic Security investigated Bell's complaints by coming to Houston several times and by calling Simon to Washington, DC at least once. (Tr. 24:4-9, 184:2-8.) Diplomatic Security, concerned by the complaints, asked Simon to communicate regularly with Bell. (Tr. 24:20-25:6; 184:14-185:1.)

In response to Bell's complaints, Simon met regularly with Bell to ensure that her complaints about his lack of communication were resolved. (Tr. 25:23-26:3.) Simon's attempts at communication with Bell met with indifference. Simon stopped by Bell's office periodically to check in, but sometimes Bell did not even look up from her desk at him. (Tr. 127:21-128:2.) Bell

herself stated that she believe Simon's efforts in response to her complaints were "fine." (Tr. 26:2-3.) Simon believed that the situation had become hostile. (Tr. 128:1.)

Simon believed Bell's complaints to be motivated out of spite as a result of Simon's inability to fulfill Bell's requests immediately. (Tr. 104:19-23.) Bell stated that Simon was being "inflexible, too rigid." (Tr. 124:21-22.) When Simon, acting upon the advice of his chain of command, asked Bell to put her requests in writing, Bell told Simon, "I don't see why I have to write anything down." (Tr. 125:11.) Bell accused Simon of acting as though she was a "hysterical woman." (Tr. 126:23.) Bell later told Simon, "If I can't get what I need from you, I will get somebody in here who will get me what I need." (Tr. 125:22-24.) Simon interpreted this comment as a threat. (Tr. 125:24.) When Simon protested that this would not be fair, Bell responded, "Simon, life is not fair." (Tr. 127:16-17.) Bell herself acknowledged that, when she gave Simon directions for which he had to receive approval from his chain-of-command, Simon obtained approval for all of her requests. (Tr. 36:13-15.)

Bell's complaints had a decidedly personal tone. When she complained about Simon's actions during the incident involving a suspicious man, she stated that Simon wished "to be seen in control and on the same level with Homeland Security" and was "more interested in playing cops with Homeland Security" than keeping her informed. (Ex. 8.) When asked whether she told a senior State Department official that Simon gave her "heartburn," Bell stated that she did not remember. (Tr. 35:9-11.) When asked whether she liked Simon, Bell avoided the question several times before finally stating that she liked him. (Tr. 33:23-34:5.) We do not credit Bell's statement that she liked Simon.

The incident culminating in Simon's dismissal arose from the presence of a suspicious man at the federal building. Simon received information from a Department of Homeland Security ("DHS") officer that a man whose name was linked to Al Qaeda was expected at the federal building that day. (Tr. 108:13-19.) When Simon met with the DHS officer, Simon told him about an individual he had seen in the building that could have been the individual identified by the DHS officer. (Tr. 109:16-110:7.) The DHS officer agreed that the man Simon saw could be the same man that the DHS officer had in mind. (Tr. 110:7.) Simon took the DHS officer to his office and called Bell and Botts from his office. (Tr. 108:21-23.) Bell told Simon that Botts would handle the situation. (Tr. 108:25-109:1.) Botts called Diplomatic Security and subsequently convened with Diplomatic Security in Simon's office along with the DHS official. (Tr. 109:7-10.) The man that Simon had seen in the morning, however, turned out not to be the man that the DHS officer had linked to Al Qaeda. (110:9-14.) The actual person of concern had been able to pick up his passport from the Passport Office and then departed from the federal building. (113:7-9.) However, due to Simon's realization of the mix-up, the DHS officer was able to stop the man outside the building. (Tr. 113:8-9.) Simon relayed confirmation to the DHS officer that the man that DHS had apprehended outside possessed the same name as the man who DHS had identified as linked to Al Qaeda. (Tr. 112:15-20.) Afterwards, Simon found Bell and Botts and informed them of what had happened. (Tr. 113:3-6.)

Bell believed that Simon had not performed his job improperly because he had failed to inform Bell and Botts immediately of the situation and then failed to provide timely updates. (Tr. 70:15-19). In addition, Bell found fault in the fact that Simon had given her incorrect information that could have resulted in a passport being issued to a person on a watch list. (Tr. 21:14-18, 113:14-21.) However, Bell's initial report and Botts' own email to other State Department

employees shows that Bell contacted Botts as soon as he was given information by DHS about the suspicious man. (Ex. 6, 7.) Bell writes in an email to Wishnefksy that she and Botts should probably have kept an eye on an internal database to see if the suspicious man had returned, but had been led astray by incorrect information provided by Simon. (Ex. 8.) The information provided by Simon, however, was not incorrect. (Ex. 6, 7.)

Bell wrote to Wishnefsky as a result of this incident to convey her lack of confidence in Simon and to request that he be removed from his position as SSM of the Houston Passport Office. (Ex. 8 at 2.) Upon receiving this request, Diplomatic Security directed Inter-Con to remove Simon as SSM. (Ex. 9.) Inter-Con wrote to Simon and notified him that he was being removed as SSM. (Ex. 11.) In its memorandum to Simon, Inter-Con stated that it had other positions available in the Washington, DC region and invited Simon to be considered for those positions. (*Id.*) Simon did not obtain another position with Inter-Con and was terminated from employment.

After ceasing employment with Inter-Con, Simon has remained unemployed. (Tr. 96:11-12.) Bell has been promoted. (8:17-18.)

Simon filed suit against Bell in state court for tortious interference with a contract. He seeks actual damages, reinstatement to his former position, and compensatory and punitive damages. Bell subsequently removed the case to this Court pursuant to 28 U.S.C. § 1442(a)(1). Bell has moved to substitute the United States of America as the proper party defendant, and the United States of America, in turn, has moved to dismiss the complaint pursuant to Rule 12(b)(1). (Doc. No. 5.)

## II.     MOTION TO SUBSTITUTE

Bell moves for substitution of the United States of America as proper party defendant in place of herself because the alleged tortious acts occurred within the scope of her employment. In response, Simon argues that Bell's acts were not conducted within the scope of her employment and has moved for an evidentiary hearing to determine the scope of employment issue.

### A. Standard

The Westfall Act provides absolute immunity to any federal employee who commits a negligent or wrongful act or omission, resulting in injury or loss of property, while acting within the scope of her office or employment. *See* 28 U.S.C. § 2679(b)(1); *Palmer v. Flaggman*, 93 F.3d 196, 200 (5th Cir. 1996) (holding that the FTCA is the exclusive remedy for a plaintiff injured by an employee of the United States acting within the scope of her employment).

The Attorney General may certify that the defendant employee was acting within the scope of her employment at the time of the incident giving rise to the plaintiff's claims. 28 U.S.C. § 2679(d)(2). If the Attorney General so certifies, the action is construed as one brought against the United States and the United States shall be substituted as the party defendant. *Id.* The Attorney General's certification is subject to judicial review. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995); *Garcia v. United States*, 62 F.3d 126, 127 (5th Cir. 1995) (en banc). In the Fifth Circuit, the plaintiff bears the burden of proof to show that the defendant's conduct was not within the scope of his or her employment, without deference to the Attorney General's certification as *prima facie* evidence of the scope of employment. *Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995). Although there is no requirement that a court conduct an evidentiary hearing or permit discovery prior to ruling on the scope of employment issue, in certain cases additional fact-finding may be necessary in order to resolve the issue. *See Barry v.*

*Stevenson*, 965 F. Supp. 1220, 1223 (E.D. Wis. 1997) (holding an evidentiary hearing because both sides had submitted competent evidence supporting their differing positions on the scope of employment issue); *Dillon v. State*, 827 F. Supp. 1258, 1264 (S.D. Miss. 1993) (in a pre-*Williams* case, denying discovery where plaintiff had not come forward with any evidence to refute government's certification).

Texas law controls the question of whether a defendant employee was acting within the scope of her employment. *Palmer*, 93 F.3d at 199 (noting that the law of the state in which the alleged misconduct occurred applies to the scope of employment question); *Williams*, 71 F.3d at 505. Under Texas law, determination of scope of employment is applied under the theory of *respondeat superior*, where employers may be held liable for negligent acts by their employees only if the employee's actions are in the course and scope of their employment. *Mata v. Andrews Transport, Inc.*, 900 S.W.2d 363, 366 (Tex. App.--Houston 1995). An employee acts within the course and scope of his employment when the tortious act: (1) falls within his general authority given to him by his employer, (2) is in furtherance of the employer's business, and (3) is for the accomplishment of the object for which the employee was hired. *Minyard Food Stores v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002); *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354 (Tex. 1971). In addition, to be within the scope of employment, "the conduct must be of the same general nature as that authorized or incidental to the conduct authorized." *Smith v. M System Food Stores, Inc.*, 297 S.W.2d 112, 114 (Tex. 1957). However, when an employee turns away from the advancement of the employer's work to engage in wholly personal pursuits, the employee is no longer acting on behalf of the employer in the scope of employment. *Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 453 (Tex. App.—Tyler 1996, no writ).

    **B. Analysis**

Simon bears the burden of demonstrating that Bell was not acting within the scope of her employment when she committed the allegedly tortious acts. Though the U.S. Attorney for the Southern District of Texas has certified that Bell was acting within the scope of her employment when the tortious acts alleged in Simon's complaint occurred, we will not defer to the certification when determining whether Simon has met his burden. (Doc. No. 5, Exh. 1.) We will apply the *Robertson* test in order to determine whether, under Texas law, Bell was acting within the course and scope of her employment at the relevant times.

### 1. Bell's General Authority

Simon contends that Bell was not acting within the general authority given to her by the State Department when she made security-related requests, voiced complaints about his job performance, and asked for his removal. Simon advances two arguments. First, he argues that Bell's authority did not include security matters or oversight of security personnel like himself. Second, he argues that Bell was not in his chain of command and so could not direct him.

Bell's general authority included oversight of the operations of the Houston Passport Office, including oversight of the safety and security of its employees, contractors, and the public. Bell and her superiors testify credibly that she was responsible for monitoring incidents that took place at the Passport Office and for reporting them to her superiors. In addition, they testify credibly that Bell was responsible for providing feedback to her superiors and to Diplomatic Security about the performance of Inter-Con employees. Though Bell was not a direct supervisor of Simon and could not unilaterally fire him, she was obligated and authorized to report any concerns she had about his performance to her superiors. We interpret her general authority to also include asking for Simon's removal from his position, since this would be a logical extension of her duties to raise concerns about his performance. Finally, with respect to

14

Bell's authority to make specific requests or give direction to Simon, it is undisputed that Bell was obligated and authorized to implement the directives given to her by the State Department. Therefore, when Bell asked Simon to change screening procedures or other practices, she was carrying out a duty that she was obligated to fulfill. Even when making requests that were not required by State Department directives, all of the requests Bell made of Simon fell within her general authority to oversee and ensure the security of her employees and the public.

Simon's second argument is more troublesome. All acknowledge that Simon was subject to a chain-of-command and State Department directive that, by its very language, prevented him from taking orders from Bell or sharing information with her. However, Bell and Roach expected Simon to disregard his chain-of-command and standing orders and to implement Bell's requests immediately. Evans testified that nothing in the chain-of-command would prevent Simon from sharing information with Bell, but this understanding contradicts the language in the order.

We sympathize with Simon, who appears to have been stuck between a rock and a hard place. On one hand, by not acceding to Bell's commands immediately, Simon incurred Bell's frustration and displeasure, which clearly mounted over time to lead to a hostile situation and constant allegations of "communication" problems. One the other hand, if Simon flouted his own chain-of-command, he risked being taken to task by Inter-Con superiors and/or by Diplomatic Security. More troublesome is that this intolerable situation was created by the State Department itself. The State Department approved General Order 1.1 and knew that the chain-of-command applicable to uniformed officers did not include directors of the passport offices. Evans testified that the order was put in place to prevent officers from taking orders from various State Department employees. However, Evans testified that he expected Simon to comply with Bell's requests even though Bell was not within his chain of command—a situation that General Order

1.1 was intended to prevent. Finally, Bell herself acknowledges that Simon obtained approval for all of her requests by following the chain-of-command.

Despite our sympathies, evidence that Bell was not within Simon's chain of command does not bear, in this case, on the issue of whether Bell's actions were within the general authority given to her *by her employer*. The *Robertson* test focuses on the general authority given to Bell by the State Department. Therefore, the Court cannot consider evidence regarding the Inter-Con chain of command in determining whether Bell acted within the general authority given to her by the State Department.

The Court concludes that Bell's allegedly tortious actions were within the general authority given to her by her employer.

### 2.  Whether Bell's Actions Furthered Her Employer's Business

Simon argues that Bell's interference with his contract with Intra-Con were not in furtherance of DOS business because they were motivated out of personal animosity and had nothing to do with office-related matters. Simon testified about various comments and threats made by Bell as a result of her frustration and growing animosity towards Simon. In addition, Simon testified as to incidents where Bell placed a disintegrator machine in his office as punishment for his behavior. Bell denies that she disliked Simon, but we do not credit this testimony.

Texas courts have stated that an employee does not act in furtherance of the employer's business when she "turns aside" or deviates from the performance of her duties for her own purposes. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007); *Texas & P. Ry. Co. v. Hagenloh*, 247 S.W.2d 236, 241 (Tex. 1952). "No liability extends to the employer when the intentional tort is 'actuated by personal animosity' and there is 'no close relation

between the [tort] and the performance of the duties of employment.'" *Rodriguez v. Sarabyn*, 129 F.3d 760, 767 (5th Cir. 1997) (quoting *Hagenloh*, 247 S.W.2d at 241). An employer is not liable for an employee's mental "turning aside" if the act was "done with *no* intention to perform it as a part of or incident to a service on account of which he is employed." *Rodriguez*, 129 F.3d at 768 (quoting Restatement (Second) of Agency § 235 (1957)); *see also Minyard*, 80 S.W.3d at 579 (adopting the same test used in *Rodriguez* to determine whether an employer could be held liable for an employee's defamatory statements). However, in circumstances "where an employee acts with two purposes—one personal and one to further the business of the employer"—liability can be imputed to the employer even if the predominant motive of the employee is personal. *Rodriguez*, 129 F.3d at 768.

Here Bell acted within her general authority when she made statements to Simon's superiors about his job performance, made requests and gave orders to Simon, and eventually requested Simon's removal. The statements she made to Wishnefsky and Evans that ultimately led to Simon's removal were within the scope of the authority she possessed and the duty she owed to her employer. In fact, Bell, Roach, and Evans all testified credibly that Bell was expected to provide feedback about the Inter-Con contract and contractor performance in order to assist Diplomatic Security in its oversight over the Inter-Con contract. Even though Bell appears to have been motivated out of some personal animosity towards Simon, Simon has not met his burden in showing that personal animosity was Bell's predominant motive in making complaints about Simon and treating him a particular manner. Instead, the comments she made "were the kind that the employees were authorized and expected to make and were closely connected to the performance of their duties." *Minyard*, 80 S.W.3d at 579 (omitting internal quotation). In addition, other actions, such as placing the disintegrator in Simon's office and

17

failing to allow him to move to his new office, were accompanied by justifiable explanations about space allocation and security measures. As such, we cannot conclude that Bell's actions were primarily motivated by reasons other than fulfilling the position for which she was employed.

### 3. Whether Bell's Actions Accomplished the Object for Which She Was Hired

Finally, Simon's argument that security of the Houston Passport Office did not fall within Bell's job description must fail in light of the evidence presented at the evidentiary hearing. It is clear that Bell was hired, in part, to oversee all the operations of the Houston Passport Office, including the safety of personnel and the public who came into the office each day. It also clear that, if a security-related incident occurred while Bell was director, she would be held responsible by her superiors for reporting that incident. Finally, Bell was required to implement several directives from the State Department that impacted site security. Overall, we find that Bell's actions, though they may have interfered with the way Simon was required to conduct his affairs, were in furtherance of her duties as director of the Passport Office.

In sum, we hold that Bell's actions occurred within the scope of her employment. Thus, we grant the motion to substitute the United States in place of Bell as Defendant in this case.

## III. MOTION TO DISMISS

### A. Standard

The court must dismiss a case when the plaintiff fails to establish subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Stockman v. Federal Election Com'n*, 138 F.3d 144, 151 (5th Cir. 1998). A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the

case. *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotation marks and citation omitted). The burden of establishing federal jurisdiction rests on the party seeking the federal forum. *Stockman*, 138 F.3d at 151.

The Federal Tort Claims Act ("FTCA") provides a waiver of governmental immunity for claims against the United States arising out of injuries caused by the wrongful acts of government employees acting within the scope of their employment. 28 U.S.C. § 1346(b). However, the FTCA does not waive government immunity for claims arising out of interference with contract rights. 28 U.S.C. § 2680(h).

### B. Analysis

The United States argues that the FTCA's waiver of governmental immunity does not extend to include the claim of tortious interference with a contract brought by Simon. Simon has not alleged any claims other than tortious interference with a contract.[1] Under § 2680(h), therefore, we are required to dismiss Simon's claims against the United States. The United States' motion to dismiss is granted.

### IV. CONCLUSION

Defendant's Motion to Substitute and Dismiss (Doc. No. 5) is **GRANTED**.

**IT IS SO ORDERED**.

**SIGNED** this 31st day of March, 2011.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[1] Simon stated in a brief that he intended to file a motion to for leave to amend his complaint and add a cause of action for defamation, intentional infliction of emotional distress, and violation of his right to due process under the Fifth Amendment. (Doc. No. 8 at 12.) However, no such motion was filed nor any amended complaint asserting these claims.